1

2

UNITED STATES DISTRICT COURT

3

DISTRICT OF MARYLAND

4

5

MAXINE AARONS GIVEN, Individually and
on behalf of All Others Similarly Situated,

**COMPLAINT -- CLASS ACTION**

6

Plaintiffs,

**DEMAND FOR JURY TRIAL**

7

v.

8

M & T BANK CORPORATION, a New York
corporation, individually and operating by and
through M & T BANK,

9

10

Defendant.

11

12

Plaintiff, on behalf of herself and all similarly situated Maryland and United States

13

residents, alleges the following:

14

15

**INTRODUCTION**

1.      This is a civil action seeking injunctive relief, monetary damages, and restitution

16

from Defendant arising out of its unfair, deceptive, and unconscionable assessment and collection

17

of excessive overdraft fees.

18

2.      While the Defendant collected thousands or millions of dollars of excessive

19

overdraft fees from its customers, the Defendant applied for and received $600,000,000 in

20

taxpayers dollars from the U.S. Treasury Department's Capital Purchase Program in 2008.

21

3.      Defendant provides debit cards and/or ATM cards (collectively herein "check

22

cards") to its checking account customers.  Through those check cards, customers may engage in

23

transactions using funds directly from their accounts or may withdraw money from their accounts

24

at automatic teller machines.  These are called "point of sale" ("POS") or "debit" transactions.

25

4.      If, according to the Defendant's accounting practices detailed below, a customer

26

does not have sufficient funds in his or her account the transaction is considered an "overdraft."

27

Defendant may honor or allow an overdraft to go through despite the lack of funds in the account.

28

If Defendant allows such a POS or debit transaction to proceed, it charges the customer's account $37 for each separate overdraft.  These fees are known as "overdraft fees."

5.     Before check cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrafted or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to purchase goods or services with a check with an expectation that funds would be available and that the check would clear.  For example, if a customer used a check to purchase groceries, the grocery store would only know if the check cleared *after* the groceries had been purchased.

6.     The same considerations are not present when the transaction is one with a check card, because banks now have the ability to know instantaneously whether the customer has sufficient funds and to communicate that information to the third party in the case of a retail transaction or to the customer in the case of an ATM transaction.  Defendant could simply decline to honor debit or POS transactions made with check cards where there are insufficient funds in the account.  Retail and service transactions would simply not take place if the consumer were unable to present an alternative form of payment, and ATM transactions would not proceed if they exceeded the customer's balance.  In fact, until a few years ago, most banks simply declined debit and/or POS transactions that would overdraw an account.

7.     Instead of declining debit and/or POS transactions when there are insufficient funds, however, or warning the customer that an overdraft fee will be assessed if he or she proceeds with the transaction, Defendant routinely processes such transactions in order to charge its customers an overdraft fee of $37, even when the transaction is for only a few dollars.  This automatic fee-based overdraft scheme (the $37 fee per transaction is one of the largest charged by a major bank) is designed and intended solely to increase overdraft fee revenue.

8.     Although it is possible to do so, Defendant does not alert its check card customers at the time a POS transaction or ATM withdrawal is made that the transaction will overdraft their account and cause them to incur fees.

9.      Because Defendant's check card customers are not notified of the potential overdraft and are not given the option to decline the check card transaction or to provide another form of payment, the customers frequently incur monetary damages in the form of overdraft fees.

10.      According to rules proposed by the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision, Treasury, and the National Credit Union Administration ("Agencies") "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

11.      Defendant's overdraft policies make it difficult for a customer to avoid injury even if, as Plaintiff does, a customer carefully tracks the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoid[able]" by the consumer.  73 F.R. 28904-01, 28929 ("It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available.").

12.      Defendant has not followed the list of "best practices" with respect to overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" (herein "Joint Guidance") (attached hereto as Exhibit A), issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation and the National Credit Union Administration.  These "best practices" include:  "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft

-3-

protection is automatically provided, permit consumers to 'opt out' of the overdraft program and provide a clear consumer disclosure of this option." 70 F.R. 9127-01, 9132.

13.    The "best practices" listed in the Joint Guidance also advise banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R.D. 9127, 9132.   The "best practices" go on to advise that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id*.

14.    The list of "best practices" set forth in the "Overdraft Protection: A Guide For Bankers" issued by the American Bankers Association includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular POS or ATM transaction will cause them to incur overdraft fees.  (*See* Exhibit B, attached, at pp. 18, 20.)

15.    Defendant does not clearly or reasonably disclose to its customers that they have the right to opt out of its overdraft scheme.  Defendant also fails to notify consumers when use of a check card, such as an ATM or POS transaction, will cause an overdraft fee.

16.    Defendant's lack of reasonable disclosure regarding the ability to opt out of the overdraft scheme and its failure to notify customers when the use of a check card, such as an ATM or POS transaction, will cause an overdraft fee, is a violation of Maryland's consumer protection laws and the implied covenant of good faith and fair dealing in the Account Agreement, governing its checking accounts.

17.    Defendant seeks to maximize the number of overdraft fees it charges check card customers because overdraft fees are a primary source of revenue for it.

18.    On August 9, 2009, an article published in the *Financial Times* stated that United States banks "stand to collect a record $38.5 [billion] in fees for customer overdrafts this year," and that "fees are nearly double those reported in 2000."  The article goes on to find that

-4-

"Overdraft fees accounted for more than three-quarters of service fees charged on customer deposits." *See* Exhibit C.

19.     Defendant's overdraft fees can cost the account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn only by a few dollars.  Even more egregious, a customer's account may not actually be overdrawn at the time the overdraft fee is charged or at the time of the POS transaction.

20.     In an effort to cause as many overdrafts as possible, Defendant manipulates and reorders debits and credits from highest to lowest during the course of a day.

21.     Upon information and belief, Defendant has a computer-automated overdraft system programmed to maximize the number of overdrafts, and thus the amount of fees charged, per customer.

22.     As a result of Defendant's manipulation of customers' transactions, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation, there would be funds in the account and no overdraft would occur.  For example, if a customer has an account with a $50 balance and makes four transactions of $10 and one later transaction of $100 the same day, Defendant debits the transactions from the account largest-to-smallest, thus subjecting the customer to four overdraft fees.  Conversely, if the $100 transaction were debited last (in the order it was made), the customer would only be subject to one overdraft fee.  *See* FDIC Study of Bank Overdraft Programs, November 2008, available at http://www.fdic.gov/bank/analytical/overdraft/, at p. 11, n.12.

23.     Thus, it is through manipulation of customers' transaction records that Defendant maximizes overdraft penalties imposed on customers.

24.     Defendant reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice is a violation of Maryland's consumer protection laws and the implied covenant of good faith and fair dealing in Defendant's General Deposit Account Agreement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

25.     In addition, Defendant misleads its customers regarding its reordering practices. Defendant fails to disclose to its customers that its reordering practices necessarily *will* result in more overdraft charges.  Defendant's statements and failures to disclose in this regard violate Maryland's consumer protection laws and the implied covenant of good faith and fair dealing in Defendant's Account Agreement.

26.     In addition, Defendant advertises "free" checking accounts that are not in fact "free" because of the improper and excessive overdraft fees that are charged.

27.     Upon information and belief, Defendant's policies alleged herein have a disproportionate impact on low-income customers.  At a time in our nation's history, where more and more people are just barely making ends meet -- if at all -- such practices are particularly pernicious.

## JURISDICTION

28.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332(d), since there are at least 100 class members in the proposed class, the combined claims of proposed class members exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than Defendant's state of citizenship, which is New York.

## VENUE

29.     Venue is proper in this district pursuant to 20 U.S.C. § 1391(a).  Defendant operates dozens of branches across the State of Maryland, with tens of thousands of customers located here.

30.     Through its substantial contacts here, Defendant is subject to personal jurisdiction in Maryland.  Pursuant to 20 U.S.C. § 1391(a), therefore, Defendant is deemed to reside in this district.

31.     Venue is also proper in the District of Maryland because many class members live here, and because Defendant has received substantial fees from Maryland consumers who hold accounts here.

**PARTIES**

32.     Plaintiff is, and at all relevant times hereto has been, a resident of Baltimore County, Maryland.  She is a customer of Defendant who was charged improper overdraft fees.

33.     Defendant, headquartered in Buffalo, New York, is a financial holding company operating by and through a wholly-owned operating entity doing business as M & T BANK, has over $70 billion in assets as of June 30, 2009, and is one of the 20 largest commercial bank holding companies in the U.S.  Defendant has over 800 branches & 1,800 ATM's across Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia, New Jersey and Washington, D.C.

**GENERAL FACTUAL ALLEGATIONS**

34.     In addition to the foregoing, Defendant is a public company (symbol "MTB") with a market capitalization of over $7 billion.

35.     Defendant is a national bank subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and OCC regulations.

36.     The terms of Defendant's checking accounts are contained in a written standard account holder agreement.  The "General Deposit Account Agreement," effective April 2007, is attached as Exhibit D (the "Account Agreement").  The Account Agreement is currently a 45-page, single-spaced document written in six-point font.

37.     The Account Agreement fails to clearly or reasonably disclose to depositors that they have the option to "opt out" of Defendant's overdraft scheme.

38.     At the time that Defendant's check card is used, for example at a POS or at an ATM, Defendant is able to determine almost instantaneously whether there are sufficient funds in a customer's account to cover that particular transaction.  Defendant has the technological capability to decline transactions or notify customers at that very moment that the particular check card transaction would result in an overdraft.  Defendant could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do this because it seeks to maximize its overdraft fees.

39.     The Account Agreement also contains an arbitration clause and a provision that arguably purports to act as a class action waiver.

40.     The arbitration is not enforceable since it designates the American Arbitration Association  ("AAA") as the forum for any arbitration and relies on its rules. AAA has suspended arbitrations, such as this dispute, related to consumer debt collections. AAA's July 23, 2009 Press Release is attached as Exhibit E.

41.     Such arbitration clause is also procedurally and substantively unconscionable and unenforceable under Maryland law in that, among other things, the Account Agreement, to the extent it may be deemed a contract at all, is a contract of adhesion because, among other reasons, it is a standardized form, imposed and drafted by Defendant, which is a party of vastly superior bargaining strength, and relegates to the depositor only the opportunity to adhere to it or reject it, and because it leads to overly harsh results for consumers and prevents consumers from having a meaningful opportunity to redress their grievances. The costs for the Plaintiff and class members to arbitrate their claims will be substantially greater than the cost to pursue this matter before this court.

42.     Under applicable Maryland law, Defendant's overdraft policies are unfair, deceptive and unconscionable in the following respects, among others:

(a)     Defendant does not clearly or reasonably disclose to customers that they have the option to "opt out" of Defendant's overdraft scheme;

(b)      Defendant does not obtain the affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

(c)     Defendant does not alert its customers that a check card transaction will trigger an overdraft fee and does not provide the customer the opportunity to cancel that transaction;

(d)     The Account Agreement, to the extent it may be deemed a contract, is a contract of adhesion in that it is a standardized form, imposed and drafted by Defendant, which is

a party of vastly superior bargaining strength, and relegates to the depositor only the opportunity to adhere to it or reject it;

(e)     The Account Agreement provided to Defendant's customers is ineffective, ambiguous, deceptive and misleading in [that it does not unambiguously state that it always reorders debits from high to low (even though Defendant always reorders transactions in this way so as to maximize overdrafts and revenue for Defendant), or] that its reordering of debits will necessarily increase the number of overdraft charges; and

(f)     The amounts of overdraft fees are disclosed in an ineffective, ambiguous, misleading and deceptive manner, since they are not contained in the Account Agreement but come, if at all, in separate documentation.

## ALLEGATIONS SPECIFIC TO PLAINTIFF

43.     Plaintiff is a current checking account customer of Defendant.   She opened her checking account with Defendant in 1987, later adding her husband's name to the account although he does not use the account.  She was issued a check card sometime after she opened this account.

44.     During her time as a checking account customer of Defendant, Plaintiff (a Certified Public Accountant and Senior Director in the Office of Development at Johns Hopkins University) scrupulously maintained a positive balance in her account.  Nonetheless, in or around April 14-15, 2008, and again in or around May 28-29, 2009, Plaintiff was charged with a total of ten (10) overdraft charges totaling $370 in fees.

45.     All four of the April 2008 charges were the result of Defendant's reordering of Plaintiff's debit and check transactions, including two POS transactions as well as an online transaction, from highest to lowest.  But for the reordering, Plaintiff would have had sufficient funds in her account to cover the transaction(s) at issue at the time of the transaction(s) at issue and would not have incurred some or all of the overdraft fees.  For example, the last charge that appears on Plaintiff's account statement for April 14th was for $12.08, a payment made for lunch at a local Baltimore creperie.  However, chronologically, that charge came before some or all of

-9-

the other charges debited to the account that day.  As a result of Defendant's scheme, Plaintiff ended up paying almost $50 for that lunch.  Further, the largest transaction, a debit for a check in an amount over $2,800, appearing first in order on Plaintiff's account statement for April 14th (and theoretically putting every transaction coming "after" it on that statement for that day in an overdraft position), was reversed by Defendant the very next day.  In other words, Defendant dishonored the check and failed to pay it – meaning that there were sufficient funds for every other transaction recorded for April 14th.  Nonetheless, because the $2,800 debit appeared on April 14th and the credit for its reversal appeared on April 15th, three additional overdraft charges were debited to Plaintiff's account.

46.    Similarly, the first four of the six May 2009 charges were the result of Defendant's reordering of Plaintiff's debit and check transactions, including a POS and online transaction, from highest to lowest.  But for the reordering, Plaintiff would have had sufficient funds in her account to cover the transaction(s) at issue at the time of the transaction(s) at issue and would not have incurred some or all of the overdraft fees.

47.    The last two of those six charges were the result of Plaintiff's being in a debit position as a result of the first four overdraft charges.  These two charges were eventually reversed by Defendant following Plaintiff's inquiry into them; but upon information and belief, many other such charges to other customers that are the result of earlier unlawful charges are not.

48.    Defendant did not reasonably provide Plaintiff with notice that she could opt out of its overdraft program.

49.    Defendant has never notified Plaintiff at the time she made these transactions, including her online payments as well as the POS transactions, that her account was overdrawn or that it would charge her an overdraft fee as a result thereof.

50.    Even when in an overdraft position as a result of overdraft fees, Defendant never declined to pay any of the additional debits.  Rather, Defendant paid such charges and charged Plaintiff with additional overdraft fees.

**CLASS ACTION ALLEGATIONS**

51.     Plaintiff brings this lawsuit as a class action pursuant to Federal Rule of Civil

Procedure 23, on behalf of herself and all others similarly situated.  The "Class" is defined as:

> All individuals residing in United States who, during the last four
> years, have had a checking account with M&T Bank, have been
> issued a check card with that account, and who have been charged
> overdraft fees, including those made in connection with a
> transactions involving a check card ("Class," "Class members,"
> "Consumer," and/or "Consumers").

52.     In addition, some of Plaintiff's claims are brought on behalf of a "Maryland

Subclass," defined as follows:

> All individuals residing in Maryland who, during the last four
> years, have had a checking account with M&T Bank, have been
> issued a check card with that account, and who have been charged
> overdraft fees, including those made in connection with a
> transactions involving a check card.

53.     The following persons shall be excluded from the Class and Maryland Subclass:

(1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be

excluded from the proposed Class and/or Maryland Subclass; (3) governmental entities; and

(4) the Judge(s) to whom this case is assigned and any immediate family members thereof.

54.     Plaintiff reserves the right to modify or amend the Class and/or Maryland Subclass

definition(s) before the Court determines whether certification is appropriate.

55.     Certification of Plaintiff's claims for class-wide treatment is appropriate because

Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claims.

        (a)     <u>Numerosity Under Rule 23(a)(1)</u>:  The members of the Class and Maryland

Subclass are so numerous that individual joinder of all the members is impracticable.  Plaintiff is

informed and believes that there are at least many thousands of Defendant customers, including at

least thousands of Defendant customers in Maryland, who have been damaged by Defendant's

unfair, deceptive, and illegal conduct alleged herein.

(b)      Commonality Under Rule 23(a)(2):  This action involves common

questions of law and fact, including, but not limited to, the following:

- Whether Defendant does not clearly disclose to check card customers that they have the right to "opt out" of Defendant's overdraft scheme;

- Whether Defendant does not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

- Whether Defendant does not alert its customers that a check card transaction will trigger an overdraft fee and does not provide customers the opportunity to cancel such transactions;

- Whether Defendant manipulates and reorders transactions so that it can increase the number of overdraft charges it imposes on customers;

- Whether Defendant manipulates and reorders debits from highest to lowest in order to maximize overdrafts;

- Whether Defendant imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

- Whether Defendant engages in practices that have damaged Plaintiff and members of the Class and Maryland Subclass;

- Whether Defendant engages in deceptive or unfair acts and practices in violation of the Maryland's Unfair and Deceptive Trade Practices Act, for which Plaintiff and the other members of the Maryland Subclass are entitled to recover;

- Whether Defendant converts the funds of Plaintiff and members of the Class and Maryland Subclass;

- Whether Defendant breaches the implied covenants of good faith and fair dealing;

- Whether Defendant is unjustly enriched as a result of its overdraft fee policies and practices;

- Whether Defendant causes injury to Plaintiff and the other members of the Class and Maryland Subclass;

- Whether Defendant engages in practices that warrant equitable and injunctive relief; and

- Whether Defendant engages in practices that warrant the award of treble damages.

(c)      Typicality Under Rule 23(a)(3):  The named Plaintiff's claims are typical

of (and not antagonistic to) the claims of the members of the Class and Maryland Subclass.

Plaintiff, like all members of the Class and Maryland Subclass, has been subject to Defendant's

overdraft charge policies and practices and has damaged by Defendant's misconduct in that she

incurred unlawful overdraft charges.  Furthermore, the factual bases of Defendant's misconduct are common to all members of the Class and Maryland Subclass and represent a common thread of unconscionable, unfair and/or deceptive misconduct resulting in injury to all members of the Class and Maryland Subclass.

(d)      Adequacy of Representation under Rule 23(a)(4):  Plaintiff is committed to the vigorous prosecution of this action.  Plaintiff will fairly and adequately protect the interests of the members of the Class and Maryland Subclass, and Plaintiff's interests are coincident with and not antagonistic to those of the other class members she seeks to represent.  Plaintiff has retained competent counsel experienced in the prosecution of class actions to represent them and the Class and Maryland Subclass.

(e)      The Class and Maryland Subclass Can be Properly Maintained Under Rules 23(b)(2) and(c).  Defendant has acted or refused to act, with respect to some or all issues presented in this Complaint, on grounds generally applicable to the Class and Maryland Subclass, thereby making appropriate final injunctive relief with respect to the Class and Maryland Subclass as a whole.

(f)      The Class and Maryland Subclass Can Be Properly Maintained Under Rules 23(b)(3) and (c).  Questions of law common to the members of the Class and Maryland Subclass predominate over any questions affecting only individual members with respect to some or all issues presented in this Complaint.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Individual litigation of the claims of all class members is impracticable because the cost of litigation would be prohibitively expensive for each class member and would impose an immense burden upon the courts.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual and legal issues.  By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented in this Complaint,

-13

presents fewer management difficulties, conserves the resources of the parties and of the court system, and is the only means to protect the rights of all class members.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Maryland Subclass Only)**
**(Violation of Maryland Consumer Protection Act)**

56.     Plaintiff, individually and on behalf of the Maryland Subclass, hereby incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

57.     This cause of action is brought pursuant to Maryland's Consumer Protection Act, MD ANN. CODE., COMM. LAW. § 13-101, et seq. ("MCPA").

58.     The Maryland legislature has stated:

> The General Assembly recognizes that there are federal and State laws which offer protection in these areas, especially insofar as consumer credit practices are concerned, but it finds that existing laws are inadequate, poorly coordinated and not widely known or adequately enforced. MD ANN. CODE., COMM. LAW. § 13-102 (a)(2).

The legislature's purpose in enacting the MCPA:

> The General Assembly concludes, therefore, that it should take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland. It is the purpose of this title to accomplish these ends and thereby maintain the health and welfare of the citizens of the State. MD ANN. CODE., COMM. LAW. § 13-102 (b)(3).

59.     MD ANN. CODE., COMM. LAW. § 13-101 (c) defines a Consumer as: "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit.

60.     MD ANN. CODE., COMM. LAW. § 13-101 (d) provides:

> "Consumer credit", "consumer debts", "consumer goods", "consumer realty", and "consumer services" mean, respectively, credit, debts or obligations, goods, real property, and services which are primarily for personal, household, family, or agricultural purposes.

61.     Plaintiff and Subclass Members are Consumers. The transactions are primarily for their personal, household or family purpose.

62.     MD Ann. Code., Comm. Law. § 13-101 (g) provides:

"Merchant" means a person who directly or indirectly either offers or makes available to consumers any consumer goods, consumer services, consumer realty, or consumer credit.

63.     The Bank is a merchant.

64.     The Bank has committed unfair or deceptive trade practices in violation of the MCPA by:

(a) the acts of the Bank complained of herein possess the tendency or capacity to mislead, or create the likelihood of deception;

(b) the acts of the Bank complained of herein violate public policy, amount to an inequitable assertion of its power and position, are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers; and

(c)  the acts of the Bank complained of herein are unconscionable.

65.     Plaintiff and the Class Members have been damaged by the Defendant's false statements and omissions.

66.     The unfair and deceptive acts of the Bank complained of herein were committed willfully.

67.     The unfair and deceptive acts of the Bank complained of herein were acts and practices that affected commerce.

68.     As a result of the Bank's violation of the MCPA, Plaintiff and members of the Maryland Subclass paid excessive amounts of money for banking services and paid excessive fees, and thereby suffered actual injury proximately caused by the Bank's conduct.

69.     Plaintiff and the members of the Maryland Subclass are therefore entitled to:

(a)      an Order requiring the Bank to cease its unfair and deceptive trade practices alleged herein;

(b)     an Order enjoining the Bank from continuing to collect overdraft fees from Maryland consumers on check-card transactions, including POS and ATM transactions, unless the consumer is notified at the time of the transaction that an overdraft fee will be charged and unless the consumer is given the option to decline the transaction without incurring an overdraft fee;

(c)     full restitution of all overdraft fees paid to the Bank on check-card transactions, including POS and ATM transactions;

(d)     compensatory damages and other damages pursuant to the MCPA;

(e)     pre-judgment interest at the highest rate allowable by law; and

(f)     payment of their attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Conversion)

70.     Plaintiff, individually and on behalf of the Class, hereby incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

71.     Plaintiff and Class members own and have the right to possess the money in their checking accounts.

72.     Defendant interfered with Plaintiff's and Class members' possession of this money and wrongfully converted the funds by assessing unwarranted and unlawful overdraft fees as the result of check card transactions, including POS and ATM transactions, despite the fact that Plaintiff and the Class members had and/or have sufficient funds in their accounts to cover these transactions at the time they were and/or are made.

73.     Plaintiff and Class members never affirmatively consented to Defendant's direct debit of overdraft fees from their checking accounts as a result of check card transactions, including POS and ATM transactions that occurred at a time when there were sufficient funds in their accounts to cover these transactions.

74.     Plaintiff and Class members have been, and will continue to be, damaged by Defendant's wrongful assessment of overdraft fees in an amount that is capable of identification through Defendant's records.

75.     Plaintiff and Class members are entitled to punitive damages because Defendant has engaged in fraud, malice or oppression.

### THIRD CAUSE OF ACTION
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

76.     Plaintiff, individually and on behalf of the Class, hereby incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

77.     Under common law, a covenant of good faith and fair dealing is implied into every contract.

78.     Defendant violated this covenant of good faith and fair dealing in its Account Agreement between it and Plaintiff and the Class by charging Plaintiff and the Class unconscionable overdraft fees and disclosing the mechanism for assessing these fees in a deceptive and misleading manner.

79.     Plaintiff and members of the Class performed all, or substantially all of the significant duties required by Defendant Services Agreement.

80.     The conditions required for Defendant's performance under its Account Agreement had occurred.

81.     Defendant unfairly interfered with the right of Plaintiff and Class members to receive the benefits under the Agreement.

82.     Plaintiff and the Class have been, and will continue to be, damaged by Defendant's breach of the implied covenant of good faith, and the resulting overdraft fees, in an amount that is capable of identification through Defendant's records.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment and Restitution)

83.     Plaintiff, individually and on behalf of the Class, hereby incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

84.     By charging excessive overdraft fees pursuant to unconscionable contract terms, Defendant unjustly received a benefit at the expense of Plaintiff and Class members.

85.     It is unjust to allow Defendant to retain the profits from its charging of unlawful and unconscionable overdraft fees without providing compensation to Plaintiff and the Class.

86.     Plaintiff and the Class conferred a benefit on Defendant; the benefit was not conferred officiously or gratuitously; the benefit is measurable, and Defendant consciously accepted the benefit.

87.     Defendant acted with conscious disregard for the rights of Plaintiff and Class members.

88.     Plaintiff and Class members are entitled to restitution.

## FIFTH CAUSE OF ACTION
### (Money Had and Received)

89.     Plaintiff, individually and on behalf of the Class, hereby incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

90.     The Defendant has obtained money from the Plaintiff and Class Members through the unwarranted and unlawful overdraft fees.

91.     In equity or in good conscience, Defendant ought not to be allowed to retain the unwarranted and unlawful overdraft fees from the Plaintiff and Class Members described herein.

92.     No rule or policy or strict law prevents Defendant from returning that which it was not entitled to in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the members of the Class and Maryland Subclass, demands a jury trial and judgment as follows:

1.      Preliminary and permanent injunctive relief enjoining Defendant from charging overdraft fees under its current policies and from engaging in the unfair and deceptive trade practices alleged herein;

2.      Restitution of all overdraft fees paid to Defendant by Plaintiff and the Class and Maryland Subclass in the past four years in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived from Defendant's misconduct;

4.      Actual damages in an amount according to proof;

5.      Prejudgment interest at the highest rate permitted by law;

6.      The costs and disbursements incurred by Plaintiff and the Class and Maryland Subclass in connection with this action, including reasonable attorneys' fees; and

7.      Such other and further relief as the Court deems just and proper.

| | | |
|---|---|---|
| 1 | Dated:      August __, 2009 | LEGG LAW FIRM, LLC |
| 2 | | |
| 3 | | By:  __/s/_Scott C. Borison_____ |
| | |       Scott C. Borison |
| 4 | | |
| | | Bar No. 22576 |
| 5 | | LEGG LAW FIRM, LLC |
| | | 5500 Buckeystown Pike |
| 6 | | Fredrick, MD  20703 |
| | | Tel: 301-620-1016 |
| 7 | | Fax:  301-620-1018 |
| | | borison@legglaw.com |
| 8 | | |
| | | Phillip R. Robinson |
| 9 | | Bar No. 27824 |
| | | Anthony DePastina |
| 10 | | Bar No. 26230 |
| | | CIVIL JUSTICE, INC. |
| 11 | | 520 W. Fayette Street, Suite 410 |
| | | Baltimore, MD 21201 |
| | | Tel: 410-706-0174 |
| 12 | | Fax : 410-706-3196 |
| | | probinson@civiljusticenetwork.org |
| 13 | | |
| | | *Counsel for Plaintiff and the Proposed Class* |
| 14 | | |
| 15 | | Nicholas A. Carlin |
| | | nac@phillaw.com |
| 16 | | R. Scott Erlewine |
| | | rse@phillaw.com |
| 17 | | David M. Given |
| | | dmg@phillaw.com |
| 18 | | PHILLIPS, ERLEWINE & GIVEN LLP |
| | | 50 California Street, 35th Floor |
| 19 | | San Francisco, CA  94111 |
| | | Tel: (415) 398-0900 |
| 20 | | Fax: (415) 398-0911 |
| 21 | | Michael W. Sobol |
| | | msobol@lchb.com |
| 22 | | Roger N. Heller |
| | | rheller@lchb.com |
| 23 | | LIEFF, CABRASER, HEIMANN & |
| | | BERNSTEIN, LLP |
| 24 | | 275 Battery Street, 30th Floor |
| | | San Francisco, CA  94111-3336 |
| 25 | | Tel: (415) 956-1000 |
| | | Fax: (415) 956-1008 |
| 26 | | |
| 27 | | |
| 28 | | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Elizabeth A. Alexander
ealexander@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
One Nashville Place
150 Fourth Avenue, North, Suite 1650
Nashville, TN  37219-2423
Tel: (615) 313-9000
Fax: (615) 313-9965


*Pending Pro Hac Vice Admisison,*
*Counsel for Plaintiff and the Proposed Class*